# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 21-0385V

| | |
|---|---|
| DEREK BLEVINS, | Chief Special Master Corcoran |
| Petitioner, | Filed: January 12, 2024 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*David John Carney, Green & Schafle LLC, Philadelphia, PA,* for Petitioner.

*Katherine Carr Esposito, U.S. Department of Justice, Washington, DC,* for Respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CLAIM[1]

On January 8, 2021, Derek Blevins filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a left shoulder injury related to vaccine administration ("SIRVA") following an influenza ("flu") vaccine he received on October 20, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

Although I find that Petitioner has more likely than not suffered the residual effects of his alleged vaccine-related injury for more than six months, Petitioner's Table SIRVA

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

claim must still be dismissed because the evidentiary record does not support the conclusion that his pain and limited range of motion were limited to the vaccinated shoulder. This leaves a possibly-meritorious causation-in-fact claim to be adjudicated, however.

## I.     Relevant Procedural History

On August 26, 2022, about 17 months after the case was initiated, Respondent filed a Rule 4(c) Report arguing that Petitioner had not established entitlement to compensation. ECF No. 27. In particular, Petitioner lacked preponderant evidence that the onset of his shoulder pain occurred within 48 hours after his flu vaccination, or that his pain and reduced range of motion were limited to his vaccinated shoulder. Rule 4(c) Report at 9-10. Respondent also argued that Petitioner cannot establish that he suffered the residual effects of his injury for more than six months as required by the Vaccine Act. Rule 4(c) Report at 8.

Thereafter, Petitioner filed a Motion for a Ruling on the Record ("Mot.") on November 15, 2022. ECF No. 29. Respondent filed a response ("Resp.") on January 13, 2023 and Petitioner filed a reply ("Repl.") on January 25, 2023. ECF No. 30-31.

The matter is now ripe for adjudication.

## II.     Factual History

Petitioner was vaccinated in his left deltoid on October 20, 2018, in Oceanside, California. Ex. 1 at 6. (Three years before, in August 2017, he injured his right clavicle, which required a surgical repair, but had no prior history of injury or dysfunction of his left shoulder or arm. *See* Ex. 5 at 149.)

Petitioner recalled that "two days following the vaccination, [he] felt something uncomfortable and painful around the injection site." Ex. 2 at ¶10. Petitioner noted that "by the third day, the pain began to worsen, and spread from [his] shoulder to [his] neck as well." *Id*. Although Petitioner hoped the pain would go away on its own, "by the third or fourth day after vaccination . . .he believed "it was not just typical vaccination discomfort." *Id*.

Two days after his vaccination, on October 22, 2018, Petitioner was arrested and had a "chest screen." Ex. 11 at 201; Ex. 15 at 13. He was released the following day. Ex. 15 at 20.

On November 20, 2018, one month after his vaccination, Petitioner visited the emergency room for his left shoulder pain. Ex 3 at 6. Petitioner reported that he had a flu shot a week ago in his left arm and "two days after, developed severe shoulder pain." *Id*.

He stated that the pain could be severe "leading to problems using his left hand." *Id*. On exam, Petitioner had full range of motion "without impingement." *Id*. at 7. X-rays were normal. *Id*. at 21. He was assessed with musculoskeletal left shoulder pain, prescribed Norco for pain, and advised to follow up with his primary care provider. *Id*. at 8, 12.

Petitioner returned to the emergency room three months later, on February 24, 2019 at 1:00 a.m. Ex. 5 at 110. He reported pain in his neck, shoulder and scapula for the previous four months after receiving a flu shot in October. *Id*. Petitioner stated that he believed the "the pain had something to do with the flu shot because that was when his pain began." *Id*. at 104. He reported that the previously prescribed pain medication had provided relief. *Id*. An EKG and left shoulder x-rays were normal. *Id*. at 106. Petitioner was assessed with musculoskeletal pain, prescribed pain medication, advised to follow up with his primary care physician, and discharged home at 6:17 a.m. *Id*.

About 12 hours later, at 6:30 p.m. on February 24, 2019, Petitioner returned to the emergency room in police custody after having been arrested and tased. Ex. 5 at 29. He was assessed for head and taser injuries in a "focused screening exam" and released. *Id*. at 29-30. Petitioner was then incarcerated until March 12, 2019. Ex. 11 at 10. He reported left shoulder pain while in prison,[3] but did not receive treatment while there. *See Id*. at 19. Petitioner stated that he had a "battle with homelessness" after his incarceration. Ex. 2 at ¶15.

Approximately nine months later, on January 3, 2020, Petitioner returned to the doctor complaining of left shoulder pain for the previous year. Ex. 4 at 12. He reported mild, aching pain and that "his shoulder gives out on him," but no decreased mobility. *Id*. Petitioner had full range of motion in his left shoulder and an x-ray was negative. Id. at 14, 20. He was prescribed ibuprofen for pain and referred to physical therapy. *Id*. at 14.

On January 10, 2020, Petitioner had an initial physical therapy evaluation. Ex. 6 at 23. He reported "that a little over a year ago [he] got a flu shot in his L arm and woke up the next morning with severe neck and shoulder pain with tingling down to his elbow." *Id*. He reported weakness and that his arm "gives out when working out." *Id*. He reported that the tingling in his arm had resolved but that he "feels like the nerves in his pinky are off." *Id*. On exam, Petitioner had normal range of motion, but demonstrated weakness, particularly with grip strength. *Id* at 25. The physical therapist recommended further assessment of Petitioner's symptoms. *Id*. Petitioner had a total of eight physical therapy treatments through February 18, 2020. *Id*. at 5. At his final session, Petitioner reported "feeling good." *Id*. Although Petitioner's grip strength had improved, he had no

---

[3] Respondent notes that Petitioner reported that his left shoulder pain was from the taser, although numerous records, including the emergency room records, indicate that Petitioner was tasered *on his back*. *See* Resp. at 4; Ex. 5 at 29; Ex. 11 at 8.

improvement in left upper extremity strength, and his physical therapist again recommended further assessment by Petitioner's physician. *Id*. at 9.

Approximately ten months later, on December 15, 2020, Petitioner returned to his doctor for treatment of left shoulder pain for two years which "started after a vaccine." Ex. 13 at 8-9. He reported "poor results" from his previous physical therapy. *Id*. On exam, Petitioner had pain with internal rotation, but normal strength and range of motion. *Id*. at 9. Petitioner was diagnosed with chronic left thoracic pain, other chronic pain, and chronic left shoulder pain. *Id*. The doctor recommended thoracic, cervical, and left shoulder MRIs, referred Petitioner to physical therapy for his thoracic pain, and referred Petitioner to an orthopedist for his shoulder. *Id*.

On December 29, 2020, Petitioner began a second course of physical therapy, focusing on his back pain. Ex. 12 at 33. He reported 12 years of neck pain and a diagnosis of neck arthritis, as well as middle back spasms which had since resolved. *Id*. He rated his cervical pain as 10/10 at worst. *Id*. His cervical and left shoulder range of motion were decreased on exam. *Id*. at 34. He had five physical therapy treatments prior to discharge on February 27, 2021. *Id*. at 26.

A January 4, 2021 MRI of Petitioner's left shoulder revealed tendinosis of the subscapularis with low-grade, partial labral tearing and minimal acromioclavicular and glenohumeral joint osteoarthritis. Ex. 14 at 11.

On January 6, 2021, Petitioner was evaluated by an orthopedist. Ex. 14 at 8. He reported left shoulder pain "that had been ongoing for several years that coincided shortly after a flu shot." *Id*. Petitioner opted to forego a cortisone injection at the time, but was referred back to physical therapy and encouraged to follow-up in six weeks. *Id*. at 9-10. He returned three weeks later reporting that he "reinjured his shoulder after trying to suddenly push himself up from his bed." *Id*. at 5. He stated that "he immediately felt pain and was not able to lift his arm." *Id*. Petitioner received a cortisone injection and was referred, again, to physical therapy. *Id*. at 7.

Petitioner began a third course of physical therapy for his left shoulder on February 3, 2021. Ex. 12 at 22. Petitioner reported that "he had a flu vaccine 2018 and had a pain after, he lost grip strength the next day." *Id*. On exam, Petitioner's flexion and abduction were reduced and his strength was diminished. *Id*. at 23. He attended seven physical therapy sessions through March 17, 2021, when he was discharged having met both short- and long-term goals. *Id*. at 3-5.

Approximately six months later, on September 20, 2021, Petitioner returned to his orthopedist. Ex. 18 at 4. He reported having a "flu vaccine 3 years ago and subsequent to this, he had severe pain and ache in the shoulder," as well as weakness in his hand. *Id*. He reported six weeks of relief from the prior steroid injection, but had continued pain

with overhead activities and being unable to weight train. *Id*. On exam, he had full range of motion. *Id*. He was diagnosed with biceps tendinitis with possible tear of the subscapularis and scheduled for surgery. *Id*. at 4-5.

Petitioner underwent surgery on October 21, 2021 and continued post-operative treatment through February 2022. *See* Ex 19 at 8-9; Ex. 20.

### III.   Applicable Legal Standards

The Vaccine Act requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act § 11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. § 13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs*., 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs*., 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] ... did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV.   Finding of Fact

### A.  Onset

Respondent maintains that Petitioner has not established Table onset because he did not report shoulder pain to medical professionals two days after his vaccination, and

because at his first appointment for shoulder pain he offered inconsistent statements on onset. Resp. at 10-11. While Respondent raises valid points, he ignores other medical records that corroborate the onset of Petitioner's pain likely occurred within 48 hours of his vaccination.

On October 22, 2018, two days after his vaccination, Petitioner was arrested and provided limited medical care, including a "chest screen" in connection with his arrest. Ex. 11 at 201. There is nothing in the record to suggest that Petitioner underwent any comprehensive medical examination or treatment. Further, when Petitioner was arrested on February 24, 2019, he again underwent a medical examination in connection with his arrest. *See* Ex. 5 at 29. He did not mention left shoulder during that examination, although he had sought treatment from the emergency room for his pain that same day. In fact, the post-arrest examination was described by the treating physician as "a focused screening" for the express purpose of determining whether Petitioner may be booked into jail. *Id*. at 30. Finally, Petitioner stated that during the first two days after vaccination, he had "hoped it would go away" and only when the pain continued did he seek treatment. Ex. 2 at ¶10. Petitioner's belief, two days after his vaccination, that his pain would resolve is a reasonable explanation for why did not mention is pain during such a limited medical encounter.

The record of November 20, 2018 (Petitioner's first treatment for his left shoulder pain), is admittedly inconsistent in its multiple references to when Petitioner's pain began. *See* Ex. 3 at 5-7. That record states that Petitioner told a nurse that "he had a flu shot about a week ago," yet also told a doctor that "he had had left shoulder pain on and off for over two weeks." *Id*. at 5. Petitioner also reported that the pain began "2 days after the flu shot," which was not stated or recorded elsewhere. *Id*. Although the reference to a flu shot "about a week ago" is incorrect, Petitioner was specific that his pain occurred two days after vaccination (notwithstanding when the vaccination was). Further, a statement that he'd had pain "on and off for over two weeks" is not necessarily inconsistent with Petitioner's pain beginning within 48 hours of his vaccination a month earlier. Petitioners are not required to accurately report the exact date of certain things, like onset, in order to satisfy the onset requirement. *Williams v. Sec'y of Health & Human Servs.*, No. 17-1046V, 2020 WL 3579763, at *5-6 (Fed. Cl. Spec. Mstr. Apr. 1, 2020).

The lack of precision in this record is also outweighed by other medical records which specifically corroborate onset occurring within 48 hours of vaccination. For example, on February 24, 2019, at Petitioner's second appointment, he reported that he believed his shoulder pain "had something to do with the flu shot because that was when his pain began." Ex. 5 at 104. He again reported close-in-time onset ("the next morning" after vaccination) at his initial physical therapy evaluation on January 10, 2020. Ex. 6 at 23. And in his affidavit, Petitioner described a "painful" feeling around the injection site two days after his vaccination. Ex. 2 at ¶10.

Respondent is correct that every record of Petitioner's treatment does not precisely set forth that onset occurred within 48 hours of vaccination, and some records are vague or slightly inconsistent. However, to satisfy the onset requirement, Petitioner need only provide a preponderance of evidence, not certainty. Accordingly, as there is support in the medical records coupled with Petitioner's affidavit testimony, I find that there is preponderant evidence to establish the onset of Petitioner's pain occurred within 48 hours of vaccination.

### B.  Symptoms Limited to the Vaccinated Shoulder

Respondent further argues that Petitioner's symptoms were not limited to the shoulder in which he received the vaccination. Resp. at 11-12. This argument finds substantially more support on the filed medical record.

Petitioner's medical records and affidavit contain repeated complaints of pain outside his left shoulder. In his affidavit, Petitioner noted that by the third day after vaccination, he was experiencing pain in his neck as well as his shoulder. Ex. 2 at ¶10. At his first medical appointment for shoulder pain, Petitioner reported "problems using his left hand." Ex. 3 at 6. At his next appointment, Petitioner reported shoulder, neck, and scapular pain. Ex. 5 at 110. At his first physical therapy evaluation, Petitioner reported that his "severe neck pain" began the day after vaccination, along with "tingling down to his elbow and decreased grip strength." Ex. 6 at 23. When Petitioner sought treatment in December 2020 (two years after his vaccination), he was diagnosed with chronic cervical and thoracic pain, and then underwent a course of physical therapy specifically for those issues. Ex. 13 at 8-9; Ex. 12. Petitioner continued to experience symptoms into his hand in 2021. Ex. 18 at 4.

While Petitioner acknowledges this evidence, he argues that because his pain "traveled from his shoulder" and because "there is no other etiology or source of his shoulder injury," he has satisfied the SIRVA Table requirement. *Id.* He relies on *Rodgers v. Sec'y of Health & Human Servs.*, No. 18-0559V, 2021 WL 4772097 (Fed. Cl. Spec. Mstr. Sept. 9, 2021) to support his argument that "the QAI language does not prevent a petitioner from satisfying the SIRVA Table Injury elements if they are pain [sic] in other areas of the body after the onset of SIRVA pain." Mot. at 23-24. In that case, however, the petitioner "consistently reported pain and difficulties with movement which was confined" to her shoulder, but later complained of "unrelated areas of pain," specifically wrist and finger pain that radiated up her arms." *Id.* at *8. Unlike the *Rodgers* petitioner, Mr. Blevins complained of neck and hand symptoms *simultaneously* with the onset of his shoulder pain after vaccination and continuing throughout his treatment. *See e.g.* Ex. 2 at ¶10 (pain spread to the neck on the third day after vaccination); Ex. 3 at 6 (problems using his left hand reported in his first appointment after vaccination).

Further, despite Petitioner's argument that there was no other etiology or source of pain, he was diagnosed with chronic pain in both his cervical and thoracic spine, and reported a long history of neck pain, even predating his vaccination. *See* Ex. 6 at 23 (tingling down his arm and feeling "like the nerves in his pinky are off"); Ex. 12 at 33 (12 years of neck pain and a diagnosis of neck arthritis, as well as middle back spasms). These types of extra-shoulder, competing symptoms have previously been held to defeat a SIRVA Table claim. *See, e.g., Rivas v. Sec'y of Health & Human Servs.*, No. 19-2020V, 2023 WL 7104791, at *4 (Fed. Cl. Spec. Mstr. Sept. 22, 2023).

Because the medical records reveal that Petitioner's pain and limited range of motion were not limited to his left shoulder, he cannot establish the third QAI for a Table SIRVA. Rather, the claim can only proceed as a causation-in-fact claim.

C.  *Severity*

Severity applies to all Program claims, and thus is another matter Petitioner must satisfy even if the claim proceeds outside the Table. To satisfy the statutory severity requirement, Petitioner must demonstrate that his symptoms more likely than not continued until at least April 20, 2019. The record is clear that Petitioner sought treatment through February 24, 2019 – approximately four months after vaccination, but then did not seek further treatment until January 3, 2020 – a gap of approximately 11 months. Respondent argues that the gap in treatment "raises doubt as to whether any alleged shoulder pain more than eleven months after his last visit is related to the subject vaccination."[4] Repl. at 9.

At the time of his emergency room visit on February 24, 2019, Petitioner was assessed with musculoskeletal pain and advised to follow up with his primary care physician within two days. Ex. 5 at 106. He was prescribed pain medication for his symptoms. *Id*. Later that same day, he was arrested and incarcerated through March 12, 2019. Ex. 15 at 28, 35. He reported his left shoulder pain during his incarceration, but received primarily mental health care, rather than physical health care, during his stay. Ex. 11 at 7-20. He received ibuprofen for pain. *Id*. at 11. There is no evidence that Petitioner's shoulder pain resolved during his incarceration, or even at this time.

Petitioner also has stated that his "medical treatment and recovery was interrupted for most of 2019 due to a brief period of incarceration and battle with homelessness," without further detail. Ex. 2 at ¶15. Although little is known of Petitioner's specific housing

---

[4] Respondent also highlights a second gap in treatment, between February 28, 2020 and December 15, 2020. Repl. at 9. But that time frame is not relevant to the severity determination, since it falls outside the immediate post-vaccination period, and goes more to other issues, like overall severity (which is relevant to damages more than this essential claim requirement).

circumstances based on what has been filed into evidence in this case, it can be ascertained that he was recorded as living in Pomona, CA at the time of his arrest. Ex. 15 at 31. Upon his release, it was noted that he intended to return to his parents' home in Oceanside, CA. Ex. 11 at 10. At his next visit on January 3, 2020, Petitioner reported living with his parents and sought to restart medication for high cholesterol, which he had stopped a year before. Ex. 13 at 14. While Petitioner could have provided more helpful detail regarding this time period, the medical records are not inconsistent with his affidavit testimony, suggesting, at a minimum, a period of time when Petitioner did not have an independent address. Further, there is no evidence *other* than the subsequent treatment gap that Petitioner's symptoms resolved. Thus, the gap itself is not especially robust evidence of cessation of his injury prior to the six-month deadline.

Further, when Petitioner resumed treatment, he consistently and regularly reported that his pain had persisted since his flu vaccination, regardless of his diligence in treating it, and specifically linked his pain to his vaccination. At his physical therapy evaluation on January 10, 2020, Petitioner described the onset of his pain with a flu shot "a little over a year ago," as well as his current and past symptoms. *See* Ex. 6 at 23. At his appointment on December 15, 2020, Petitioner reported that his "pain and weakness started after a vaccine" and had persisted for two years. Ex. 13 at 8-9. On January 6, 2021, Petitioner reported left shoulder pain "that had been ongoing for several years that coincided shortly after a flu shot." Ex. 14 at 8. On September 20, 2021, Petitioner reported having a "flu vaccine 3 years ago and subsequent to this, he had severe pain and ache in the shoulder," as well as weakness in his hand. Ex. 18 at 4. There is no evidence in the record of another cause of Petitioner's shoulder pain.

After consideration of the entire record, I find that the evidence preponderates in Petitioner's favor on this issue, if weakly. It appears more likely than not that Petitioner continued to experience symptoms – at least during the gap in treatment between February 24, 2019 and January 3, 2020 - suggesting that Petitioner had an injury that never fully resolved, but was not so severe as to cause him to seek more regular or robust treatment. That issue ultimately goes to the amount of damages awarded – but does not defeat Petitioner's entitlement to compensation.

**Conclusion**

Petitioner has established that he suffered the residual effects of his alleged vaccine-related injury for at least six months. However, as I also find that Petitioner has not preponderantly established that his pain and reduced mobility was limited to vaccinated shoulder, he cannot proceed in this action with a Table SIRVA claim. Accordingly, Petitioner's Table SIRVA claim is dismissed. The case will be reassigned to

a Special Master outside of the Special Processing Unit ("SPU"), for adjudication as a causation-in-fact claim.

      **IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
